**Stephen L. BARTLETT, Appellee,**

v.

**Colonel C.E. FISHER; Captain S.T. Davis, Appellants.**

**No. 91–2595.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1992.

Decided Aug. 13, 1992.

Timothy William Anderson, Jefferson City, Mo., argued (William L. Webster and Timothy W. Anderson, on the brief), for appellants.

Sherry A. Rozell, Springfield, Mo., argued (Rodney E. Loomer, Sherry A. Rozell and Joseph P. Winget, on the brief), for appellee.

Before BOWMAN, MAGILL, and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Trooper Stephen L. Bartlett of the Missouri State Highway Patrol commenced this § 1983 action against two superior officers, Col. C.E. Fisher and Capt. S.T. Davis, claiming that they violated his First Amendment and due process rights by suspending him for twenty-five days. The suspension was ostensibly for submitting false Activity Reports overstating the number of warnings issued to motorists, but Bartlett alleges that it was in fact retaliation for his letter to Missouri Governor John Ashcroft complaining that a new "minimum work standards" policy was in fact a ticket-writing quota system. Defendants appeal the district court's denial of their motion for summary judgment on the ground of qualified immunity. We reverse.

I.

In late 1987, Trooper Bartlett was assigned to Troop G, under the command of defendant Davis. From 1982 through 1986, Bartlett had received consistently high annual evaluation scores, though he was criticized for a shortage of "public contacts"—traffic tickets, warnings, and services provided to motorists. Capt. Davis was considering a new "minimum work standards" policy designed to monitor and thereby increase the public contacts by troopers in Troop G. Bartlett told his supervisors the proposed policy was a bad idea.

On February 2, 1988, Bartlett's new supervisors, Cpl. Daugherty and Sgt. Middleton, completed his 1987 annual evaluation. His score dropped sharply from the previous year; his reported weaknesses were: "Trooper Bartlett is low in total contacts and spends too much time off the road. He is also weak in following the chain of command." Bartlett blamed this low evaluation on his criticism of the proposed minimum work policy.

On March 8, Capt. Davis instituted the minimum work policy, effective April 1. Bartlett failed to meet his minimum standard of public contacts during April, June, and July 1988. On August 19, he met with

Capt. Davis, "voiced his concerns" about the "quota system," and told Davis he planned to complain to the Governor. Three days later, Bartlett wrote Governor Ashcroft:

> What I want to tell you about is a minimum work requirement system that requires each Trooper to make a required number of arrest[s] and warnings each month.... What is happening Troopers are writing more tickets because they are afraid not to.... One officer told me he is easy on the local people, but not the tourist[s].... [M]ost all the people in my area.... are very upset that the Highway Patrol would implement such a program and they want it stopped. Many of these same people will be writing their representatives.... Governor, I am not looking for any personal gain by writing this letter. I would say I have put myself in jeopardy by blowing the whistle on this program, but I will continue to do what I feel is right.

Bartlett personally delivered copies of the letter to three state senators. He admits that it was widely disseminated. Capt. Davis rescinded the "minimum standards" policy two days after his meeting with Bartlett. Davis testified that he made this decision before learning Bartlett had written the Governor; Bartlett takes credit for getting the minimum standards policy rescinded.

In February 1989, Bartlett received his 1988 annual evaluation. His score again dropped sharply; he complained, but it was raised only slightly after he met with supervisors Daugherty and Middleton, Capt. Davis, and Lt. J.J. Ewers. Bartlett then filed a grievance, alleging that he was being punished for criticizing the "quota" policy in a letter to the Governor. On April 11, a grievance hearing board upheld his 1988 evaluation as "fair and objective," finding no evidence of retaliation.

In late March, Daugherty and Middleton began investigating the accuracy of certain Activity Reports that Bartlett had submitted to the Patrol, specifically, whether Bartlett had in fact issued reported warnings to motorists in February and March

1989, six months after the alleged "quota" policy was rescinded. Bartlett was notified and responded to the allegations informally.

On April 19, 1989, defendant Fisher was first appointed Superintendent of the Missouri Highway Patrol. His appointment was confirmed on April 26. In July, at Bartlett's request, Col. Fisher transferred Bartlett to Troop E under the command of Capt. D.R. Shelton.

On June 28, Lt. Ewers reported to Capt. Davis that nine of Bartlett's Activity Reports had been found to be invalid and another one doubtful. On October 25, after further investigation that included giving Bartlett an opportunity to respond in writing, Capt. Davis filed a formal charge accusing Bartlett of filing seven falsified reports and recommending a thirty-day suspension.

Bartlett appealed to a three-member Disciplinary Review Board consisting of two Troopers and a Lieutenant with no connection to this matter. The Board conducted a formal hearing at which Bartlett testified, presented a witness, and read affidavits. He was not permitted to present evidence that the recommended suspension was in retaliation for his writing the Governor. On December 19, the Board issued a thirteen-page written decision, finding that Bartlett had submitted six false Activity Reports and recommending that the proposed thirty-day suspension be upheld.

Col. Fisher as Superintendent had final authority to impose the recommended suspension. In a two-hour meeting with Col. Fisher, Bartlett responded to the charges and presented his retaliation theory. Fisher also met with Capt. Davis, who defended his recommended suspension, and with Capt. Shelton, Bartlett's new supervisor, who recommended that Bartlett be reprimanded but not suspended. Fisher concluded that the more severe discipline was warranted, but reduced the suspension to twenty-five days, effective January 1, 1990.

Rather than appeal Col. Fisher's final decision to state court, Bartlett completed his suspension, which cost him $2,500 in lost pay, and filed this § 1983 action. He

alleges that Fisher and Davis denied him procedural due process by failing to follow Patrol procedures and by denying him a fair hearing, and that Fisher and Davis violated his First and Fourteenth Amendment rights by suspending him in retaliation for criticizing the "quota" policy in a letter to the Governor. Defendants moved for summary judgment on numerous grounds. The district court rejected defendants' arguments on the merits of the case after a lengthy discussion, and then summarily rejected their qualified immunity argument because "a reasonably objective public official would have known that termination of an employee for his speech concerning misconduct by public officials would violate a clearly established constitutional right." Dist.Ct. Order of July 27, 1991, at 24–25, quoting *Brawner v. City of Richardson*, 855 F.2d 187, 193 (5th Cir. 1988).

■ Defendants on appeal seek to raise all the issues discussed by the district court in its denial of their motion for summary judgment. We have jurisdiction to consider the qualified immunity defense in this interlocutory appeal; we review this issue de novo. *See Ford v. Dowd*, 931 F.2d 1286, 1289 (8th Cir.1990). We also have jurisdiction "to decide closely related issues of law," *Drake v. Scott*, 812 F.2d 395, 399 (8th Cir.), *adhered to on reh.*, 823 F.2d 239, *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). However, given our resolution of the qualified immunity issue, and the strong policy disfavoring interlocutory appeals, we do not reach these other issues.

## II.

The doctrine of qualified immunity reflects the fundamental judgment that the public interest is not served by imposing damage liability on public servants for the good faith performance of their discretionary duties. As Chief Justice Burger said for a unanimous Court in *Scheuer v. Rhodes*, 416 U.S. 232, 242, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90 (1974):

> Implicit in the idea that officials have some immunity ... for their acts, is a

recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

Although qualified immunity was initially limited to actions taken in good faith, the Supreme Court has adopted an entirely objective standard to ensure that the defense will permit "the dismissal of insubstantial lawsuits without trial." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Under this objective standard, public officials are entitled to qualified immunity when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

In addition to the objective standard, the Supreme Court has adopted procedures to ensure that qualified immunity provides effective protection against unnecessary litigation risk and expense. Qualified immunity is a question of law that "ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). When the defendant moves for summary judgment on this ground, the district court first looks at whether the actions alleged:

> are actions that a reasonable officer could have believed lawful. If they are, then [defendant] is entitled to dismissal prior to discovery. If they are not, and if the actions [defendant] claims he took are different from those [plaintiff] allege[s] (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [defendant's] motion for summary judgment on qualified immunity grounds can be resolved.

*Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). If the court concludes that the defendant "acted reasonably under settled law in the circumstances," it must grant summary judgment sustaining the qualified immunity defense. *Hunter v. Bryant*, 112 S.Ct. at 537. And the district court's

decision denying summary judgment on the question of qualified immunity is immediately appealable "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 530, 105 S.Ct. 2806, 2815, 2817, 86 L.Ed.2d 411 (1985).

### III.

■ Bartlett's procedural due process claim is based upon his allegation that Fisher and Davis violated the Patrol's regulations, principally because Davis instituted the formal charges after Bartlett had transferred to a different command.[1] The district court did not discuss qualified immunity as it applies to Bartlett's procedural due process claim. This was clear error. In *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Supreme Court reversed a damage award in favor of an employee of the Florida Highway Patrol who claimed that his discharge deprived him of procedural due process. In sustaining the qualified immunity defense, the Court specifically held:

> Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some [state] statutory or administrative provision.

468 U.S. at 194, 104 S.Ct. at 3019. Thus, defendants' alleged violations of the Patrol's regulations are *irrelevant* to the qualified immunity question before us, except insofar as a violation might reflect a deprivation of procedural due process as defined by federal law. *See Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 649 (D.C.Cir.1987); *Robison v. Via*, 821 F.2d 913, 923 (2d Cir.1987); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1527 (11th Cir.1987). As we said in *Edwards v. Baer*, 863 F.2d 606, 608 (8th Cir.1988), "police department guidelines do not create a constitutional right."

■ The parameters of the federal constitutional right to procedural due process are far more general. In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546,

105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985), the Supreme Court held that public employees with a property interest in their positions are entitled to "notice and an opportunity to respond" prior to discharge. In *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), the Court held that a public school student was entitled, prior to suspension, to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." These standards apply to the suspension of a public employee who has a property interest in retaining the job. *See Garraghty v. Jordan*, 830 F.2d 1295 (4th Cir.1987); *Pesce v. J. Sterling Morton High Sch. Dist. 201*, 830 F.2d 789 (7th Cir.1987); *Boals v. Gray*, 775 F.2d 686 (6th Cir.1985).

■ In this case, the undisputed facts show that defendants provided Bartlett (i) notice of the charges being investigated and an informal opportunity to respond before formal charges were initiated by Capt. Davis; (ii) a full evidentiary hearing before the Disciplinary Review Board; and (iii) a private two-hour meeting with the ultimate decision maker, Col. Fisher, at which Bartlett responded to the charges and argued his retaliation theory. This was obviously far more "elaborate" pre-suspension process than is constitutionally required. *See Loudermill*, 470 U.S. at 545–46, 105 S.Ct. at 1495.

■ Bartlett alleges that the hearing was unfair because the three members of the Disciplinary Review Board "were strongly biased in favor of the Highway Patrol," and because he was precluded from presenting his retaliation theory at the Board hearing. Even if true, Bartlett's suggestion that the Board members were unconstitutionally biased decision makers because they agreed with the rescinded minimum standards policy is frivolous. *See Hortonville Joint School Dist. No. 1 v.*

---

**1.** Although our decision in *Hughes v. Whitmer*, 714 F.2d 1407, 1413–17 (8th Cir.1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), casts doubt on whether Bartlett has

alleged a property or liberty interest that qualifies for due process protection, defendants have not raised that issue.

*Hortonville Educ. Ass'n*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976). And Bartlett concedes that he was permitted to argue his retaliation theory in his two hour meeting with Col. Fisher, the ultimate decision maker. Thus, the undisputed facts of record conclusively demonstrate that it was reasonable for Col. Fisher and Capt. Davis to conclude that they had provided Bartlett "the fundamentals of due process." *Davis v. Scherer*, 468 U.S. at 192, 104 S.Ct. at 3018. Defendants are therefore entitled to summary judgment on their qualified immunity defense to Bartlett's procedural due process claim.

### IV.

Bartlett alleges in Count II of his Complaint that his First Amendment rights were violated when he was suspended for writing a letter to the Governor on a matter of public concern. The district court denied their qualified immunity motion because defendants' motive in disciplining Bartlett is a disputed issue of fact and the law is "clearly established" that a public employee may not be disciplined in retaliation for protected First Amendment speech. We disagree.

Although "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), this First Amendment right is not absolute. If a public employee has been disciplined for engaging in protected speech, whether that discipline violated the First Amendment requires a careful balance of "the interests of the [employee], as a citizen, commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), quoted in *Connick*, 461 U.S. at 140, 103 S.Ct. at 1686. The qualified nature of this constitutional right must be considered in determining whether the individuals who imposed the discipline are entitled to qualified immunity. That was the essential holding of *Anderson v. Creighton:*

> For example, the right to due process of law is quite clearly established by the Due Process Clause.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*.... [T]herefore ... the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.

483 U.S. at 639–40, 107 S.Ct. at 3039.

At least five circuits have concluded that, because *Pickering*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established" for purposes of the *Harlow* qualified immunity standard. As the court said in *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986):

> It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow*. With *Harlow's* elimination of the inquiry into the actual motivations of the official, qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.

*Accord, Guercio v. Brody*, 911 F.2d 1179, 1183–85 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991); *Melton v. Oklahoma City*, 879 F.2d 706, 728–29 (10th Cir.1989), *overruled on other grounds*, 928 F.2d 920 (10th Cir.1991) (en banc); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1324 (11th Cir. 1989); *Noyola v. Texas Dept. of Human Resources*, 846 F.2d 1021, 1024 (5th Cir. 1988) ("[t]here will rarely be a basis for *a priori* judgment that the termination or

discipline of a public employee violated [his] 'clearly established constitutional rights' ").

The district court relied upon *Brawner v. City of Richardson*, 855 F.2d 187, 192–93 (5th Cir.1988), and *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1408 (9th Cir.1988), in holding that Bartlett's alleged First Amendment right was "clearly established" under *Harlow*. To the extent that those decisions broadly define that constitutional right, we conclude they conflict with *Anderson v. Creighton*. "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). To provide that ample protection in this context, the employer's justification for the discipline must be taken into account in determining whether the defendants' conduct was objectively unreasonable, that is, whether "no reasonably competent officer would have concluded" that the discipline could be imposed without violating the employee's First Amendment rights. *Id.*

Our decision in *Powell v. Basham*, 921 F.2d 165, 168 (8th Cir.1990), is not to the contrary because it did not involve the *Pickering* balancing test: "Defendants have not yet produced any evidence to show that Powell's criticisms adversely affected the efficiency of the department." Like *Powell*, our decisions in *Darnell v. Ford*, 903 F.2d 556 (8th Cir.1990), and *Cooper v. Petray*, 854 F.2d 301 (8th Cir.1988), are factually distinguishable because defendants made no attempt to invoke the *Pickering* balancing test in support of their qualified immunity defenses.

■ Applying the correct, "particularized" standard, we conclude that defendants are entitled to qualified immunity even if Bartlett's letter to the Governor was a motivating factor in his suspension.[2] In support of their motion for summary judgment, defendants placed the *Pickering* balancing test squarely at issue by presenting evidence that Bartlett's letter to the Governor had an adverse impact on the Patrol. The letter adversely affected Troop morale because Bartlett's immediate supervisors were angry that he had taken his criticism of the new minimum standards policy outside the Patrol's normal chain of command. By accusing the Patrol of an anti-tourist "quota policy," and directing that accusation to elected public officials, the letter damaged the Patrol's reputation and created significant political problems. Because the letter was widely disseminated to the general public, it brought further discredit to the Patrol, as evidenced by an affidavit from Sgt. Middleton describing the many people who confronted him with Bartlett's accusation that the Patrol had adopted a quota system, including an arrested drunk driver who belligerently asserted that he was being made part of the Patrol's "quota." *Compare Rankin v. McPherson*, 483 U.S. 378, 388–392, 107 S.Ct. 2891, 2899–2901, 97 L.Ed.2d 315 (1987).

Finally, Bartlett unquestionably had a personal interest in complaining about the policy; he had failed to meet his "minimum standards" in the early months of the policy and was facing discipline or even discharge if he did not improve. Thus, his First Amendment interest "as a citizen, commenting on matters of public concern" was outweighed by his self-interest in the matter. As the Supreme Court said in *Connick*, 461 U.S. at 153, 103 S.Ct. at 1693:

> When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.

■ In these circumstances, we think it clear that Col. Fisher and Capt. Davis

---

**2.** Defendants allege that Bartlett was disciplined because he falsified Activity Reports, not in retaliation for his letter to the Governor. Although the record supports this contention, our resolution of the *Pickering* qualified immunity question makes it unnecessary to reach the issue of defendants' motives.

acted in an objectively reasonable manner in concluding that Bartlett could be suspended on account of his letter to the Governor without violating "clearly established" First Amendment rights. In deciding whether to impose discipline, defendants were entitled to consider whether Bartlett's letter was a proper way for a trooper to express his views on an internal policy debate, as well as the adverse impact of Bartlett's letter on the Patrol. As we said in *Hughes v. Whitmer:*

> More so than the typical government employer, the [Missouri Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution."

> \* \* \* \* \* \*

> Pursuant to this substantial interest, the Patrol, as a paramilitary force, should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks. This requires judicial deference on two levels in this case. First, the Patrol's determination that an officer's speech-related conduct has contributed to dissension within the ranks is entitled to considerable deference. Second, the Patrol's discretionary decision to reassign or discipline an officer whose speech-related conduct has contributed to dissension is similarly entitled to considerable deference.

714 F.2d at 1419 (citations omitted). *See also Crain v. Bd. of Police Comm'rs,* 920 F.2d 1402, 1410–12 (8th Cir.1990); *Busby v. City of Orlando,* 931 F.2d 764, 773–75 (11th Cir.1991); *Egger v. Phillips,* 710 F.2d 292, 327–28 (7th Cir.) (Coffey, J., concurring), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).[3]

**3.** Factually analogous cases are highly relevant to the qualified immunity inquiry when the constitutional right in question is subject to a balancing test. *See Benson,* 786 F.2d at 276; *Melton,* 879 F.2d at 729 & n. 36. "This is not to say that an official action is protected by qualified

Accordingly, defendants have established the defense of qualified immunity with respect to Bartlett's First Amendment claim. That is, Col. Fisher and Capt. Davis did not violate Bartlett's "clearly established rights of which a reasonable person would have known" in recommending and deciding that Bartlett should be suspended for twenty-five days for his admitted violations of Patrol procedures, even if this discipline was motivated by their displeasure over Bartlett's earlier, unrelated letter to the Governor.

The order of the district court denying defendants' motion for summary judgment on their qualified immunity defense is reversed and the case is remanded for further proceedings consistent with this opinion.

immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.