_____

No. 95-2245
_____

Lee Moorman, Jr.,                       *
                                        *
          Plaintiff-Appellee,           *
                                        *
     v.                                 *
                                        *
John A. Thalacker, sued as John         *
Thalacker; Larry Brimeyer;              *
Thomas Luensman, sued as C/O            *
Luensman; Jerome Manternach,            *
sued as Jerry Manternach,               *
                                        *
          Defendant-Appellants,         *
                                        *
Charles Lee,                            *    Appeal from the United States
                                        *    District Court for the
          Defendant,                    *    Northern District of Iowa.
                                        *
Harold Wood,                            *
                                        *
          Defendant-Appellant,          *

_____

No. 95-2297
_____

Lee Moorman, Jr.,                       *
                                        *
          Plaintiff-Appellant,          *
                                        *
     v.                                 *
                                        *
John A. Thalacker, sued as John         *
Thalacker; Larry Brimeyer;              *
Thomas Luensman, sued as C/O            *
Luensman; Jerome Manternach,            *
sued as Jerry Manternach;               *
Charles Lee; Harold Wood,               *
                                        *
          Defendant-Appellees,          *

_____

Submitted:  February 12, 1996

Filed:  May 14, 1996

_____

Before BOWMAN, BEAM, and LOKEN, Circuit Judges.

_____

BEAM, Circuit Judge.

Lee Moorman was disciplined after he was found to have violated prison regulations.  The discipline included the loss of sixteen days of good time.  He filed suit under 42 U.S.C. § 1983 claiming that prison officials violated his rights to due process.  The district court[1] denied the officials qualified immunity and ruled in favor of Moorman.  Moorman appeals the determination of damages and the prison officials appeal both the district court's denial of qualified immunity and its determination of liability on the merits.  We reverse.

## I. BACKGROUND

In 1984, Moorman was sentenced to twenty-five years in prison for an armed robbery which he committed using his father's .357 magnum handgun.  In September 1989, a prison guard overheard an interchange between Moorman and a fellow inmate about obtaining handguns.  Moorman, who was anticipating release in the near future, stated that he intended to obtain his father's gun again immediately upon his release from prison.  Moorman also stated that if he could not persuade his father to give him the .357 magnum (which both inmates agreed was the most desirable model), he would go out and purchase one.

The guard filed a disciplinary report and Moorman was disciplined under prison rules 41 and 11.  Rule 11 forbids inmates from engaging in conduct which is a felony under state or federal

_____

[1]The case was tried before a magistrate with the parties' consent.

law.  Rule 41, among other things, forbids inmates from "attempt[ing] to commit any of the [offenses covered in Rule 11] or [being] in complicity with others who are committing or attempting to commit any of the [offenses covered by Rule 11]."  Information Guide, Iowa State Men's Reformatory, pp. 10, 14 (June 1989).  Thus, Moorman was disciplined for an "attempt" to possess a firearm as a convicted felon.  His discipline consisted of the loss of 16 days good time, 15 days of the highest level of disciplinary detention, and 107 days in progressively less restricted disciplinary detention.[2]  Moorman was paroled on October 26, 1990, after serving six years of his sentence.

Moorman's state court postconviction action challenging the disciplinary action was declared moot because he was paroled before it came to trial.[3]  He filed this section 1983 action in July 1991.  The district court determined there was no evidence that Moorman had violated Rules 41 and 11.  It therefore ruled that the prison officials had violated Moorman's due process rights when they disciplined him.  The court found that Moorman was injured by the disciplinary detention and by the loss of wages incurred due to his transfer to a higher security institution.  It awarded $3,602.55 in damages for those injuries.

Moorman, who was paroled within a year of the incident, also claimed that but for the discipline he would have been paroled sooner.  He requested damages for the delay.  The district court found that there was no credible evidence that Moorman's parole was

---

[2]Moorman was also transferred from a minimum security institution to a medium security institution as a result of the disciplinary report.

[3]Moorman's motion for summary judgment claiming issue preclusion, which was based on an eventual state court finding in favor of the other inmate, was correctly denied by the district court.  As the district court pointed out, the two inmates played different roles, with Moorman being the main player.  That ruling has not been appealed.

delayed by the discipline, and that, in any case, the exchange for which Moorman was disciplined would have been proper grounds for such a delay. Therefore, the court found that Moorman had suffered no injury and refused to award any damages for the alleged delay. The district court did not consider or award any damages for the loss of good time.

Moorman appeals the court's damages award, claiming that he should have been compensated not just for the disciplinary segregation but also for the transfer from a minimum to a medium security institution and for the alleged delay in parole. The prison officials appeal the district court's ruling on the merits and its denial of their claim of qualified immunity.

## II. DISCUSSION

### A. Claims of the Prison Officials

The question of qualified immunity is an issue of law which we review de novo. White v. Holmes, 21 F.3d 277, 279 (8th Cir. 1994). To consider a prisoner's claim against a prison official, we must first determine whether he or she has alleged the violation of a federal statutory or constitutional right, and if so, whether that right is clearly established. Id.; Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). If the conduct complained of violates no constitutional right, the complaint must be dismissed. Get Away, 969 F.2d at 666. In this case, a recent Supreme Court decision and the state of the record make it uncertain whether Moorman has alleged the violation of any constitutional right. See Sandin v. Conner, 115 S. Ct. 2293 (1995) (disciplinary segregated confinement of inmate falls within the expected parameters of prison sentence, and does not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest).

In <u>Sandin</u>, the Court explained that whether an inmate has a liberty interest protected by due process depends on the nature of the interest at stake and not just on the mandatory or precatory nature of the institutional procedures governing that interest. <u>Id.</u> at 2299-2300. The Court so held to extricate the federal courts from inappropriate micromanagement of the common incidents of prison life which its former approach had encouraged. See <u>id.</u> (citing cases claiming or finding constitutionally protected interests in dictionaries, tray lunches, unrestricted furlough travel, big cells with television outlets, food loafs & boot camp participation). The former emphasis on the mere nature of the rules without critical consideration of the underlying interest encouraged prisoners to make federal cases out of trivial disagreements and discouraged prisons from codifying their administrative procedures, thus perversely encouraging arbitrary action by rudderless employees. <u>Id.</u> at 2299.

<u>Sandin</u> concluded that the inmate had no liberty interest in avoiding the disciplinary confinement in issue in that case because that confinement did not present an atypical and significant deprivation in relation to the ordinary incidents of prison life. <u>Id.</u> at 2301. Therefore, the Due Process Clause was not implicated despite the mandatory nature of the rules relating to the imposition of disciplinary confinement. The Court stated that there are some deprivations, and not necessarily those so severe as to independently trigger due process protection, against which states could conceivably create a liberty interest. <u>Id.</u> at 2300. Those are deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences. <u>Id.</u> at 2300-01. While Conner's segregated and solitary confinement was not such a deprivation, the Court noted that prisoners nonetheless retain protection from arbitrary state action even within the expected conditions of confinement through the First and Eighth Amendments, the Equal Protection Clause,

internal prison grievance procedures, and state judicial review.  Id. at 2302 n.11.

While we are unsure whether Moorman's confinement was a dramatic departure from the ordinary incidents of prison life, we think not. Admittedly, his environment was disrupted by the transfer, but there is no liberty interest in assignment to any particular prison.  See Meachum v. Fano, 427 U.S. 215, 224 (1976).  Thus, constitutionally speaking, such assignments are discretionary, so long as they are not done for prohibited or invidious reasons and do not rise to independent constitutional violations on their own weight.  See Vitek v. Jones, 445 U.S. 480, 493 (1980); Sisneros v. Nix, 884 F. Supp. 1313, 1346 (S.D. Iowa 1995).  The disciplinary detention at issue here is within that same category.  Moorman does not allege any invidious or prohibited reason for his detention, and the detention appears no more severe than that in Sandin.  It does not appear to have been a disruption exceeding the ordinary incidents of prison life.

Therefore, the only deprivation of which Moorman may complain is that of his good time credits.  However, as Wolff v. McDonnell makes clear, good time credits alone are not liberty interests.  418 U.S. 539, 557 (1974). To be so considered, the state must have created a mandatory scheme which necessarily affects the duration of a prisoner's sentence.  See id.; Sandin, 115 S. Ct. at 2297.  Because the loss of good time credits did not enter into the district court's decision, it made no determination as to whether such credits were mandatory in nature or whether their loss injured Moorman.  While neither party has directed us to any authority on whether Iowa's good time provisions are mandatory in nature, we note that the Iowa statutes dealing with good time credits simply direct that "[a]n inmate shall not be discharged from . . . custody . . . until the inmate has served the full term . . . less good conduct time earned."  Iowa Code Ann. § 903A.5 (West 1994 & Supp. 1996).  Further, the Iowa statutes merely indicate that inmates are

eligible to receive good time for good behavior, unlike the mandatory statute at issue in <u>Wolff</u>. <u>Compare</u> Iowa Code Ann. § 903A.2 ("[e]ach inmate . . . is eligible for a reduction of sentence . . . for . . . good conduct) <u>with</u> <u>Wolff</u>, 418 U.S. at 546 n.6 (reproducing the applicable Nebraska statute, which directs that the warden "shall" reduce sentences by specified amounts for good time and that such time "shall" apply to mandatory parole). Finally, under Iowa law, good time may be revoked for bare "violat[ion of] an institutional rule," Iowa Code Ann. § 903A.3, whereas the scheme in question in <u>Wolff</u> specifically barred revocation of good time credit except in cases of "flagrant or serious misconduct." <u>Wolff</u>, 418 at 545 n.5. Thus, given its highly discretionary nature, it is unclear that Iowa's statutory scheme creates a liberty interest in good time.[4]

However, even assuming that Moorman has alleged the violation of a constitutional right, we find that the district court should have granted the officers qualified immunity.

---

[4]According to the state, even if Moorman has alleged a violation of his constitutional rights, other recent Supreme Court decisions put into question whether he may vindicate the particular violation alleged through a 42 U.S.C. § 1983 action. <u>See</u> <u>Heck v. Humphrey</u>, 114 S. Ct. 2364, 2370 (1994) (a prisoner's action challenging the validity or length of confinement must be brought in habeas, but a challenge to procedures underlying confinement may be brought under section 1983 if use of the wrong procedure does not vitiate the confinement itself). A habeas petitioner must have exhausted state remedies before bringing a federal habeas petition, while a section 1983 plaintiff may proceed directly to federal court. Moorman points out that he did exhaust his state remedies, by bringing his state habeas action which was declared moot. Thus, he argues, finding the label of this action determinative would be elevating form over substance. We are inclined to agree, especially since <u>Heck</u> specifically distinguishes <u>Wolff</u> as a proper section 1983 action wherein the petitioner sought damages for the use of the wrong procedure, not restoration of the credits or a remedy which necessarily vitiated their denial. <u>Heck</u>, 114 S. Ct. at 2370. That is what we understand Moorman to be seeking.

The district court based its ruling on its determination that the "some evidence" rule had been violated, i.e., that there was no evidence that Moorman violated the rule in question.  See Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 447 & 455 (1985) (due process requires that "some evidence" support decisions of prison disciplinary boards affecting liberty interests); Goff v. Dailey, 991 F.2d 1437, 1440-42 (8th Cir.) (prison officials' use of "some evidence" burden of proof for disciplinary decisions satisfies due process), cert. denied, 114 S. Ct. 564 (1993).  In order to do so, the district court evaluated the considerable evidence of the event in question, and, after legal analysis, decided that that conduct could not constitute an "attempt."  We think the district court applied the wrong standard and the wrong analysis.

The proper analysis was not whether there was "some evidence" of a rules violation, which goes to whether there is a sufficient quantum of evidence for the disciplinary committee to find that the prisoner actually committed the conduct of which he accused.  See Superintendent v. Hill, 472 U.S. at 455-56 ("some evidence" is evidentiary standard to be applied to factual findings); Goff, 991 F.2d at 1140-42 (prison officials' factual findings based on "some evidence" burden of proof satisfy due process).  Rather, the question presented is whether the committee was justified in finding that the conduct in question, which was amply supported by the evidence, constituted a violation of the rules.  To decide this issue, we look to the officials' interpretation and application of the prison rules.

Where there is no clearly established judicial interpretation to the contrary, we defer to prison officials' interpretation and application of their rules to the facts so long as that interpretation and application is not objectively unreasonable.  See Henderson v. Baird, 29 F.3d 464, 468 (8th Cir. 1994) (interpretation of "assault" to include throwing orange juice on a

guard not objectively unreasonable), <u>cert. denied</u>, 115 S. Ct. 2584 (1995).
In this case, as the district court recognized, whether or not the exchange
in question ought to be characterized as an "attempt" depends on whether
it amounted to a "plan."[5]  <u>See</u> <u>Freitas v. Auger</u>, 837 F.2d 806, 807, 809,
811 (8th Cir. 1988) (prison may not punish an inmate for attempted escape
for simply talking about escape, but may punish an inmate for planning or
complicity in planning one).  The district court, after some analysis,
decided that the conduct in this case did not amount to a "plan" because
there was no overt act.  Whether it is the district court's or the prison
officials' determination (as to what constitutes a "plan") that is
ultimately found to be correct, the question is certainly arguable and open
to debate.  <u>Freitas</u> does not set out clearly established guidelines as to
which verbal exchanges amount to "plans" and which amount to mere talk, nor
does it indicate verbal exchanges alone may never be "plans."  Thus, there
was no established judicial interpretation of "plan" which was patently
contrary to the officials' application in this case.  <u>See</u> <u>Cornell v. Woods</u>,
69 F.3d 1383, 1390 (8th Cir. 1995) (qualified immunity protects officials'
discretionary acts unless pre-existing law renders unlawfulness of act
apparent).

The law of "attempt" is complex and fraught with intricacies and
doctrinal divergences.  Qualified immunity protects prison officials from
liability for their objectively reasonable efforts to divine whether a
course of conduct amounts to an "attempt," even should their answer be
arguably wrong.  <u>See</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986) (qualified
immunity protects mistakes, mistaken judgments and "all but the plainly
incompetent or those who knowingly violate the law"); <u>Bartlett v. Fisher</u>,
972 F.2d 911, 914 (8th Cir. 1992) (qualified immunity protects reasonable

---

[5]The prison regulations define attempt as "when, with intent
to commit an offense, the inmate engages in conduct which tends to
effect the commission of such offense."  Information Guide at 8.

errors); <u>Gorra v. Hanson</u>, 880 F.2d 95, 97-98 (8th Cir. 1989) (qualified immunity protects officials' reasonable interpretations of law); <u>McCurry v. Tesch</u>, 824 F.2d 638, 642 (8th Cir. 1987) (officials need not correctly anticipate appellate interpretation of legal maxims about which even the courts disagree in order to avoid paying damages out of their own pockets). The officials, presented with a prisoner nearing his release date detailing his intentions to obtain the precise weapon which he had previously used to ill-effect, delineating exactly how that weapon was to be acquired, and specifying his backup method for procuring an identical weapon should the first fail, could reasonably interpret such conduct as a "plan." This is the classic situation for which qualified immunity is designed; prison officials interpreting and applying their disciplinary regulations in a not objectively unreasonable fashion in order to maintain discipline and order in the institution. <u>See generally</u> <u>Sandin</u>, 115 S. Ct. at 2299-301; <u>Bell v. Wolfish</u>, 441 U.S. 520, 544 (1979).

**B. Claims of Moorman**

Since the district court erred in denying the prison officials' claim of qualified immunity, we do not address Moorman's complaints as to the inadequacy of his damages award. Moorman's motion to strike the state's <u>Heck</u> argument (<u>supra</u> n.4) is denied.

**III. CONCLUSION**

Because the prison officials should have been granted qualified immunity, we reverse the judgment of the district court and remand with directions that judgment be entered in the officials' favor.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.