McMILLIAN, Circuit Judge,
with whom JOHN R. GIBSON, Circuit Judge, joins, dissenting.
We respectfully dissent. In our original panel opinion, Burnham v. Ianni 98 F.3d 1007 (8th Cir.), vacated, 98 F.3d 1028 (1996), we fully set forth our analysis of this case. We therefore rest upon our original panel opinion as providing the reasons why we believe lanni should be afforded qualified immunity in the present case. The following is a response to the majority opinion.
I.
We begin by noting the conspicuous absence from the majority opinion of certain undisputed material facts concerning the circumstances in which this controversy arose— facts which the majority has all but ignored by reducing them to a few obtuse sentences and a footnote. See supra at 672, 673 & n. 5. By contrast, the district court appropriately devoted four full paragraphs at the outset of its opinion to these crucial facts aptly described by the district court as the “milieu” of the case. Burnham v. Ianni, 899 F.Supp. at 397. As the district court explained:
In June 1991, Sandra Featherman was appointed to the post of vice chancellor for [UMD], Shortly after her appointment was announced, Featherman began receiving threats. The threats were bizarre, graphic and frightening:
The dogs are howling, they want blood. There are footsteps crunching on the forest floor — it’s the deer hunters coming. They’re after blood, too. It’s the same dream over and over. The deer hunters stalking — getting closer and closer, never giving up the hunt, never putting down their rifles. Overwhelmed by their desire to kill,
Federman (sic) no Duluth stay away, we will kidnap you, the FBI can’t protect you.
The deer hunters.
At the same time that Featherman was being threatened, forged memoranda bearing the defendant’s name, were circulated in and about the campus. The memoranda referred to an alleged plot to kidnap Featherman and used the terms “Prince of Death” and “Deer Hunters.” The forged document was circulated through the mail to various departments and left in hallways of various campus buildings.
Beginning in March 1992, history Professor Judith Trolander became the target of threats. The caption on the flyers left in the hallways of various University buildings was: “The Imperial Council of Deer Hunters Proclaim Open Season on Judy Trolander Lesbian Feminist Bitch.” The memorandum purported to reveal Professor Trolander’s home address, addressed questions concerning the appropriate weapons and provided the reader with potential locations from which to carry out an attack. Finally, the flyer proclaimed: “Get cracking you kill crazy buckaroos. Its [sic] OK to kill her, the Imperial Council rules UMD, the Commission on Women is dissolved.” The flyer specifically addressed Professor Trolander, but its threat was targeted to all faculty members who cooperated with Vice Chancellor Ianni’s efforts to develop a diversity program: “[a]ll faculty would be sentenced to death along with their pets, children and spouses.”
Defendant undertook to calm the concerns of the faculty regarding these incidents. Despite his distribution of a memorandum in which he addressed the seriousness with which he was taking the threats and in which he reiterated his commitment to the diversity program, the fears of many in the campus were not alleviated. The investigation of the origin of the threats continued and the threats continued to hang over the campus. It is *682 this background against which the substance of this litigation arose.

Id.

Not only do we find it necessary to supply these critical facts, we also caution that there is no legal basis to assume as true facts “derived from the plaintiffs’ pleadings” merely “[bjecause discovery has not been conducted in this case.” Supra at 670. In ruling on a motion for summary judgment, the question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir.1992). Where discovery has not been conducted, the record created by the parties pursuant to Fed. R.Civ.P. 56 might not include the usual panoply of discovered documents and deposition transcripts, but will include any affidavits or other documents properly submitted in accordance with Fed.R.Civ.P. 56(e). If, upon reviewing the record in the light most favorable to the non-moving party, some material facts asserted in the non-moving party’s pleadings remain genuinely disputed, there is no legal basis to assume such facts as true merely because discovery has not been conducted. In the present case, for example, the majority opinion states “[pjlaintijfs dispute that any milieu of concern existed and contend that the campus atmosphere, whatever it may have been, was not aggravated or affected by the two photographs.” Supra at 673 (emphasis added). The majority supplements the above-underscored statement by later noting that “both Burnham and Márchese, by affidavit, expressly dispute that a ‘climate of fear and violence’ existed on the campus, stating that campus life continued as normal, no classes were suspended or schedules altered and not a single act of violence occurred on the UMD premises.” Id. at 680 (emphasis added). Presumably, the majority’s assumptions that no milieu of concern existed at the time the photographs were removed, and that campus life continued as normal, have formed the basis for the majority’s decision to virtually ignore the facts set forth above. However, according to undisputed evidence in the record, less than two months before the photographs were removed, anonymously-written flyers were left in hallways of various UMD buildings on campus, and those flyers stated the following:
She [Professor Trolander] will be a good target for shooting at long range. The house has large windows and the terrain is clear of obstacles in all directions. Shooting from the beach or even from a boat in the bay or lake Superior is feasible. A 30-60 rifle with 20X2 Bushnell scope would be a suitable weapon with dum-dum bullets dipped in poison. Don’t forget to put in a couple of clicks in the crosshairs for wind-age as the wind is usually strong there. It is recommended that the hunter shoot from behind the Surf and Sand Health Center, if there is return fire from the house it will only kill a few old people. She is the only occupant of the house, so it is OK to shoot silhouettes on drawn shades.
Get cracking you kill crazy buckaroos. Its OK to kill her, the Imperial Counsel rules UMD, the commission on women is dissolved.
Also, all faculty members ordered to participate in Featherman’s administrative development project will be sentenced to death along with their pets, children, and spouses if they comply with these orders. Any one who cooperates with Featherman will have their target information published.
The deer hunters need target information on Featherman, just mention where she lives in the faculty club and everything will be taken care of.
Appellant’s Appendix at 38. We certainly agree with the majority’s description of the above-quoted death threat as “deranged.” Supra at 672. However, viewing the record in *683 the light most favorable to plaintiffs and applying the Rule 56 standard, we would also find plaintiffs’ description of campus life as “normal” to be patently inaccurate. Even the district court stated, consistent with the Rule 56 standard, that, despite Ianni’s efforts to assuage concerns on campus, “the fears of many in the campus community were not alleviated. The investigation of the origin of the threats continued and the threats continued to hang over the campus.” 899 F.Supp. at 397. As the district court concluded, “[i]t is this background against which the substance of this litigation arose.” Id.
II.
We now turn to the legal issues presented by this case, beginning with a reminder of the principles that underlie the doctrine of qualified immunity. In Anderson v. Creighton, 483 U.S. at 638, 107 S.Ct. at 3038 (citations omitted), the Supreme Court explained:
When government officials abuse their offices, “action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.” On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.
The Court then went on to explain:
Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the “objective legal reasonableness” of the action, assessed in light of the legal rules that were “clearly established” at the time it was taken.
Id. at 639, 107 S.Ct. at 3038 (citations omitted). In Anderson v. Creighton, the Supreme Court also addressed the degree of
generality versus specificity with which the relevant legal rule is to be defined for purposes of determining whether the law was “clearly established” at the time of the relevant events. Id. The Court explained that, in order for the concept of a “clearly established” law to comport with the “objective legal reasonableness” standard set forth in Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. at 2738-39, “the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.” Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039. “This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.” Id. (citations omitted).
We believe, in the present case, that it could not have been apparent to Ianni that the actions he took were unlawful in light of the pre-existing law. Indeed, “the parameters of the protection afforded to a university professor’s academic speech were not clearly defined in May 1992 and are not clearly defined today.” Scallet v. Rosenblum, No. 96-1138, 1997 WL 33077, at *2 (4th Cir. Jan. 29,1997) (unpublished) (per curiam) (Scallet) (disposition reported in table at 106 F.3d 391), cert. denied, - U.S. -, 117 S.Ct. 2482, 138 L.Ed.2d 990 (1997).
As we explained in our original panel opinion, the issue of whether the removal of the two photographs violated Burnham’s and Marchese’s First Amendment right to engage in nonverbal expressive behavior is governed by the Pickering-Connick-Waters line of Supreme Court cases dealing with the First Amendment rights of public employees. The mere fact that the circumstances of this case are unique (at least in terms of the controversies that have actually been litigated in federal court) makes this no less an employment-related ease. Thus, the pertinent case law in existence at the time Ianni removed the photographs from the display case included the Supreme Court’s decisions in Connick and Pickering, as well as a body of lower federal court decisions which had *684 applied Connick and Pickering — -none of which were factually similar to the present case.
Contrary to the majority’s assertion, Kincade is not “directly on point and directly contradictory to Ianni’s position.” Supra at 680. Kincade is distinguishable because, in that case, this court held that the Pickering balancing test had not been put at issue. This court reasoned that the defendants, city officials, “ha[d] merely asserted that Kincade’s speech adversely affected the efficiency of the City’s operations and substantially disrupted the work environment without presenting any specific evidence to support this assertion.” Kincade, 64 F.3d at 398 (emphasis added) (cited supra at 680). By contrast, in the present case, Ianni presented specific evidence showing that the photographs were already having a disruptive effect on the work environment and that their continued display in the history department display case had the potential to further disrupt the work environment. Before Ianni ever made the decision to have the photographs removed, meetings were held, involving Karon, Ianni, the Kohns, Burnham, Márchese, and other faculty members in the history department, at which the fate of the two photographs was specifically addressed. It is clear from the récord that feelings were strong on both sides: some individuals felt that the display of photographs of professors holding weapons was inappropriate in light of the campus-wide death threats against Trolander and others; others felt adamantly opposed to removing the photographs for that reason. See Appellant’s Appendix at 50 (internal history department memorandum: “[sjomehow, this ugly trend of History governance by external administrators and bureaucrats must be called into account; if the photo display is our line in the sand, so be it”). With respect to one of the meetings, Karon stated:
Chancellor Larry Ianni and I [Karon] met with the history department faculty on one occasion during the first few days of May. Department members offered a variety of reasons for not wanting to take the photos down. Some said the request was an undue interference with the department, or an attempt to blame the department for the threats. Others said it was Judy Trolander’s fault. Professor Trolander expressed her concern that no one knew how upsetting the photos were to her.
Appellant’s Appendix at 12 (Affidavit of Judith Karon, ¶ 13).
We think it fair to say that Ianni, as the unlucky decisionmaker in this employment-related controversy, was between a rock and a hard place. Regardless of whether he decided to have the photographs removed or left alone, it was reasonable for him to assume that some faculty members would be quite upset. In explaining his decision to remove the photographs, Ianni stated in his affidavit that the situation with which he was dealing was unique in his experience, that he tried suggesting to the history department faculty that “it would be an act of eollegiality to remove the photos” and they “should all be sympathetic to the effects of the agitation on campus,” and that, after the history department refused to accept his suggestion, he ordered the photographs removed with the intent “to try to maintain a positive and efficient working and learning environment conducive to the mission of an academic institution.” Id. at 7-8 (Affidavit of Lawrence Ianni, ¶¶ 8-11). Ianni himself was not personally opposed to the photographs. See Supplemental Appendix of Appellees at 37 (Affidavit of Albert Burnham, ¶4 (“Ianni stated that he personally saw nothing wrong with the pictures”)). He had them removed because of their antagonistic effect.
Plaintiffs have not disputed the truthfulness of Ianni’s stated reason for removing the photographs, nor have plaintiffs alleged or identified anything in the record to suggest that Ianni had any motive other than those which he described in his affidavit. Instead, plaintiffs maintain that it was utterly irrational for Ianni to think that removing the photographs would serve his stated goal. Looking upon Ianni’s actions with the benefit of hindsight, the majority agrees with plaintiffs and further concludes that Ianni’s actions also violated clearly established First Amendment law as it existed in May of 1992. We disagree.
*685 As we have noted, even today the parameters of the First Amendment protection afforded to university professors’ academic speech is not clearly defined — much less so at the time this controversy arose. See Scallet, 1997 WL 33077, at *2. Moreover, viewing the record in the light most favorable to plaintiffs does not dispel the fact that, no matter what course of action Ianni had followed with respect to the two photographs, the end result would have been the dissatisfaction of some faculty members, and most likely disruption to the work environment— at least insofar as those who had already taken sides were concerned. Faced with this highly unusual and unenviable predicament, Ianni chose to have the photographs removed, in the hopes of maintaining a positive and efficient working and learning environment. In our opinion, it is not appropriate, given the facts of this case, for this court to now decide the qualified immunity issue on the basis of whether we think Ianni should have dismissed the concerns expressed by Trolander, Karon, and others as irrational or unjustified; that was a matter with which Ianni, as the responsible school administrator, was forced to grapple at that time. The circumstances only permitted him to accommodate one side’s interests or the other’s, but not both. We believe that the Supreme Court has indicated, as a matter of substantive First Amendment law, that it may not be appropriate for this court to second-guess Ianni’s handling of this employment-related matter. As the Supreme Court stated in Waters, 511 U.S. at 675, 114 S.Ct. at 1887-88 (emphasis added):
The key to First Amendment analysis of government employment decisions ... is this: The government’s interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.
We also reiterate a point emphasized in our original panel opinion. In considering the weight to be given Ianni’s perceptions and predictions of disruption, the law provides that the disruption need not have been actual, but may have been merely potential. Id. at 681, 114 S.Ct. at 1890-91 (holding, as a matter of law, that the potential disruptiveness of the speech was enough to outweigh whatever First Amendment value it might have had); Tindle, 56 F.3d at 972 (“[a] showing of actual disruption is not always required in the balancing process under Pickering ”); accord Jeffries, 52 F.3d at 13 (noting that Waters stresses that actual disruption is not required). Notably, on this particular point, Kincade does not even mention Waters, let alone rely on that Supreme Court precedent. In light of Waters, its progeny, and our understanding of Ianni’s predicament in this ease, we conclude that Ianni did not violate Burnham’s or Marchese’s First Amendment right to engage in nonverbal expressive conduct when he ordered the removal of the two photographs from the display case; in any event, he certainly did not violate their clearly established First Amendment rights. “In view of the difficulty that federal courts themselves have had in grappling with the concepts of academic freedom both as to the teacher and the educational institution, [Vice Chancellor Ianni, who is] not trained in the law could hardly be expected to recognize the contours of [Burnham’s and Marchese’s] rights.” Scallet, 1997 WL 33077, at *2. We would therefore hold that Ianni is entitled to qualified immunity with respect to the claims brought by Burnham and Márchese based upon their alleged nonverbal expressive conduct.[20]
*686 Finally, we believe that our position is well-grounded in Eighth Circuit jurisprudence. In Grantham v. Trickey, 21 F.3d at 292-95, Judge Hansen, writing for a panel of this court, set forth a comprehensive and balanced historical analysis of Eighth Circuit case law dealing specifically with the applicability of qualified immunity in the public employee speech context. In Grantham v. Trickey, id. at 295, this court affirmed the district court’s grant of summary judgment for the defendants on the basis of qualified immunity upon determining that it was appropriate under the circumstances of that case to follow the analysis of Bartlett v. Fisher, 972 F.2d 911 (8th Cir.1992) (reversing the district court’s denial of summary judgment for the defendants on the basis of qualified immunity). In Bartlett v. Fisher, id. at 914, 916-17, Judge Loken also took care to recognize the historical and policy-based underpinnings of the qualified immunity doctrine in this area of First Amendment law. In reasoning that the defendants in that case were entitled to qualified immunity, Judge Loken noted “[a]t least five circuits have concluded that, because Pickering’s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered ‘clearly established’ for purposes of the Harlow qualified immunity standard.”[21] Id. at 916 (emphasis added) (quoted in Grantham v. Trickey, 21 F.3d at 293). We, too, agree with this general statement of the law and think that the present case is not an exception.[22] Even if we were to agree with the majority of this en banc court that Ianni has violated plaintiffs’ clearly established First Amendment rights, we would favor acknowledging the above-quoted rule of law, which takes into account the tensions and subtleties that lie in this area of First Amendment jurisprudence, particularly when superimposed with the doctrine of qualified immunity.
III.
We now turn to the forum-related arguments. Plaintiffs, including the Kohns, assert a violation of their First Amendment right to use the display case as a means “to publicize some of the areas of expertise and interest of the History Department’s faculty, while at the same time portraying the faculty in an informal, somewhat humorous way.” In analyzing this claim, we agree with the district court’s conclusion that the history *687 department display case was a nonpublic forum. 899 F.Supp. at 403 (focusing on facts that the display case was under UMD’s control, that UMD allowed members of the history club to use it upon request, and that the display ease was dedicated to use of the UMD history department for disseminating information about the department). Because the display ease was a nonpublic forum, the issue as to whether a First Amendment violation resulted from the removal of the two photographs turns on whether “the distinctions drawn [were] reasonable in light of the purpose served by the forum and [were] viewpoint neutral.” Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451. So long as these requirements are met, “[c]ontrol over access to a nonpublic forum can be based on subject matter.” Id. “The reasonableness of the Government’s restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances.” Id. at 809, 105 S.Ct. at 3453. We believe that Ianni’s decision to remove the two photographs was not an unreasonable subject matter restriction in light of the purpose of the forum, which was to disseminate information about the history department, and because his actions were narrowly tailored and left open other channels through which Burnham’s and Marchese’s interests in classical and American military history could still be publicized.[23] See Perry, 460 U.S. at 53, 103 S.Ct. at 959 (“the reasonableness of the limitations ... is also supported by the substantial alternative channels that remain open”). Moreover, Ianni has demonstrated beyond any dispute that his removal of the photographs had nothing whatsoever to do with any viewpoint which the photographs may have expressed. Contrary to the majority’s conclusion, this was not “an effort to suppress expression merely because [Ianni] oppose[d] the speakers’] view[s].” Id. at 46, 103 S.Ct. at 955. Burn-ham himself alleges that “Ianni stated that he personally saw nothing wrong with the pictures.” Supplemental Appendix of Appellees at 37 (Affidavit of Albert Burnham, ¶ 4). Ianni was motivated solely by his desire to address the potential disruptiveness of the photographs, which had already been foreshadowed by the diametrically opposed views expressed at the history department meetings.
The majority states that “[t]he photographs of Professors Burnham and Márchese expressed the plaintiffs’ view that the study of history necessarily involves a study of military history, including the use of military weapons.” Supra at 676. There is absolutely nothing in the record stating or implying that Ianni or anyone else opposed such a view about the study of history. The majority further states that Ianni had the photographs removed “[b]ecause other persons on the UMD campus objected ... to allowing this viewpoint to be expressed in this particular way.” Id. This is precisely the point that we have been making all along — Ianni was attempting to address the potential disruptiveness of the photographs, not any viewpoint expressed by them. Moreover, his actions were not unreasonable in light of the circumstances. Nothing in his actions prevented plaintiffs from expressing the above-described message through other means— which, in fact, they clearly could do through the exhibit’s written descriptions of the professors’ academic interests. See Supplemental Appendix of Appellees at 30 (Affidavit of Ronald Márchese, ¶ 9 (“Professor Burnham listed U.S. Military History among his principal interests”)). We also think the reasonableness of Ianni’s actions is supported by the facts that, after school resumed the following fall, the two photographs were posted in the student center and Ianni took no action at that time because “[t]he atmosphere was substantially calmer after the summer break of 1992.” Appellant’s Appendix at 8 (Affidavit of Lawrence Ianni, ¶ 12).
In sum, we would hold as a matter of law that Ianni did not violate plaintiffs’ First Amendment rights by regulating the use of the display case. We most certainly believe that his actions did not violate any clearly established First Amendment rights and, thus, he should be afforded qualified immuni *688 ty with respect to plaintiffs’ forum-related claims.
IV.
Ianni did not violate any of plaintiffs’ First Amendment rights when he ordered the removal of the two photographs from the display case. More importantly, given the “background against which the substance of this litigation arose,” 899 F.Supp. at 397, and the lack of clarity in the applicable law as it existed in May of 1992, Ianni should be afforded qualified immunity. He should be spared from having to further defend himself in this litigation and from having to pay money damages to UMD history professors Albert Burnham and Ronald Márchese and former UMD students Michael Kohn and Louise Kohn.

. In light of the complexities of the law with which we are dealing, including the balancing process required by the First Amendment and the “clearly established" standard imposed by the qualified immunity doctrine, we are not swayed by plaintiffs’ allegations that Ianni himself speculated that “if we [plaintiffs] sued him, he ‘would not stand a chance,' or words to that effect." Supplemental Appendix of Appellees at 38 (Affidavit of Albert Burnham, ¶ 8); see also id. at 40 (Affidavit of Richard Morris (stating, for example, that "[w]hile I do not recall the exact words used by Chancellor Ianni, I understood the import of his remarks to be that he believed *686 that the censorship of the photographs violated the legal rights of the persons involved.”)).

. A very similar view has been expressed by our court in other constitutional contexts. For example, in Manzano v. South Dakota Dep’t of Social Servs., 60 F.3d 505, 509-11 (8th Cir.1995), we observed that the constitutionally protected liberty interest which parents have in familial integrity is not absolute, and when a parent alleges that official conduct infringed upon that right, the merits of that constitutional challenge are determined by a balancing test. We then observed that "[t]he need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome.” Id. at 510. "Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable." Id. (citing cases). In Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987), also a case involving the constitutional right of familial integrity, we applied the doctrine of qualified immunity after noting our agreement with the Seventh Circuit’s observation in Benson v. Allphin, 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), that, when a determination of constitutional protection turns on application of a balancing lest, "the right can rarely be considered 'clearly established,’ at least in the absence of closely corresponding factual and legal precedent.”

. We are by no means suggesting that qualified immunity will protect public officials in every instance where the applicable constitutional standard involves a balancing test. As plaintiffs have pointed out, this court has on at least two occasions denied qualified immunity to school officials who violated teachers' First Amendment rights under Pickering. See Southside Pub. Schs. v. Hill, 827 F.2d 270, 272-75 (8th Cir.1987) (denying qualified immunity to defendants, school officials, who had constructively terminated elementary school teachers in retaliation for having written a letter to the state department of education complaining about violations of the federal statutory requirement that handicapped children be provided a free appropriate public education); Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 318 (8th Cir.1986) (qualified immunity denied to school superintendent and school board members who fired school principal for the stated reason, among others, that he had publicly criticized their decision to transfer his wife from the high school to the junior high school level).

. For example, nothing prevented plaintiffs from replacing the removed photographs with similar pictures of Burnham and Márchese without weapons, while continuing to publicize through written descriptions their interests in American military and classical history.