BEAM, Circuit Judge,
dissenting.
Under this opinion of the court, the plaintiffs/appellees can burn an American flag outside the University history department, Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), but cannot advance, as students and members of the history faculty, expressive conduct intended to support and publicize areas of teaching expertise and special interest within the department. This content-based suppression was clearly not an act by the University chancellor that properly balanced free speech against work place tranquility. It was, rather, as aptly stated by the district court, unvarnished censorship. The court’s opinion is not a demonstration of legitimate First Amendment jurisprudence but is, rather, an example of the triumph of the political correctness agenda of three or four campus personalities over well-established free speech rights of students and faculty. From this result, I dissent.
I. FACTS
The court sets forth what it calls “underlying facts” that are “generally not in dispute.” Supra at 1010. The opinion omits, however, other “undisputed” facts of importance to the case and several disputed material facts as well. Since this matter is before the court on motion for summary judgment[11] based on a claim of qualified immunity, the court “ordinarily must look at the record in the light most favorable to the party [plaintiffs/appel-lees] opposing the motion, drawing all inferences most favorable to that party.” Harlow v. Fitzgerald, 457 U.S. 800, 816 n. 26, 102 S.Ct. 2727, 2737 n. 26, 73 L.Ed.2d 396 (1982). With this requirement in mind, a more complete recitation of the facts, some of them perhaps disputable at trial, based upon the affidavits in the record as annotated in the appellees’ brief, is necessary.
Plaintiff Burnham has been a part-time professorial member of the history department at the University of Minnesota-Duluth (UMD) since 1986. He holds a Ph.D. and his special expertise is United States history, particularly military history.
Plaintiff Márchese is a tenured professor in the University of Minnesota system. He is a professor of humanities, classics and history at UMD and a professor of ancient history and archaeology in the Center for Ancient Studies at the University of Minnesota-Minneapolis.
The History Club, active for a number of years on campus, operates under the auspices of the UMD history department. At all relevant times, Professor Burnham was faculty advisor to the Club.
*1021 During the fall quarter of 1991, two student members of the History Club, plaintiffs Michael and Louise Kohn, conceived an idea for a project that was intended to publicize some of the areas of expertise and interest of the history department’s faculty, while at the same time portraying the faculty in an informal, somewhat humorous way. The Kohns approached Professors Burnham and Márch-ese as well as other members of the department, all of whom agreed to participate. They agreed to pose for a picture with a “prop” that related to their areas of interest. They also agreed to supply information about their areas of interest, their academic background, their historical heroes, and to supply a quotation to be used along with the above information and their photographs.
For his photograph, Professor Márchese elected to pose with an ancient Roman short sword while wearing a cardboard laurel wreath. He listed his specialties as “Ancient Greece and Rome, Homeric Literature” and identified Homer and Alexander the Great as historical heroes. He chose to pose with the Roman sword for two reasons. First, he likes to use tangible objects in his lectures, and he had previously used the sword in that way. Second, one of his interests is military history. He believes that a thorough knowledge of the ancient world must include an appreciation for the military culture and techniques that allowed Rome to gain and hold an ascendancy over the Mediterranean world. His courses on ancient history include far more than military history, but he thinks that military history is an important aspect of that era. Hence he believed the Roman sword was an appropriate “prop” for his photograph.
Professor Burnham’s special interest in American history includes military history in particular. Among the historical heroes he listed were John Adams and Davy Crockett. Consistent with his professional interests, he posed with a .45 caliber military pistol, wearing a coonskin cap.
A total of eleven professors posed for or supplied pictures. The Kohns assembled an exhibit that incorporated these photographs along with the written comments submitted by each faculty member.
The photographs and the accompanying written material comprising the exhibit communicated something of considerable public interest. The exhibit was intended to be viewed by students and prospective students, as well as any members of the public who might be on the premises. Its purpose was to inform students and prospective students about the interests and areas of expertise of the professors in the department. It was also intended to communicate information about the professors and their attitudes toward history — as reflected, for example, in their choices of historical heroes.
The exhibit was put up in the history department’s display case, located in the public corridor next to the classrooms used by the department, on March 27, 1992. This display case is designed to hold material that communicates ideas to the public. The case and its contents are seen by students who are taking classes located in the vicinity, by faculty members, and by members of the general public. The display case is reserved for the use of the history department. The plaintiffs allege that the case has contained, for a number of years, an exhibit on Roman siege warfare equipment that was assembled by Professor Márchese. The case has been used by members of the History Club as well as by the history department faculty. The ease is used only to communicate matters that are considered to be of public interest. It is not used for private communications, like a mailbox or a message system.
The exhibit was observed by hundreds if not thousands of people. Members of the department received many compliments on the presentation, as did the students who assembled it. For two weeks no one expressed any criticism of the exhibit. The display appeared to make a contribution to morale and good relations within the department itself.
On April 10, 1992, Judith Karon (who was then UMD’s affirmative action officer) and UMD Police Captain Harry Michalicek came to the history department and viewed the exhibit. It was subsequently learned that this was in response to a complaint by Charlotte Macleod, an assistant professor who *1022 was the head of the UMD Commission on Women. Karon went to the departmental secretary, Elizabeth Kwapick, and demanded that the pictures of Professors Burnham and Márchese be removed. This demand was denied by the department.
Professor Burnham called a lawyer in the University of Minnesota’s Legal Department, who told him that she could find nothing wrong with the display as described. The history department agreed that the department should resist any attempt by the administration to censor the photographs, and the department declined to remove them.
On April 27, 1992, Karon sent a memorandum to the Dean of the College of Liberal Arts, John Red Horse, stating that she expected the photos to be removed immediately because she found them to be “totally inappropriate.” Dean Red Horse apparently refused to act on Karon’s request. On April 30, 1992, Karon sent Professor Burnham a memorandum explaining her reasons for wanting to censor the photographs of Professors Burnham and Márchese. In her memorandum, Karon again stated that she ordered the exhibit censored because she found the photographs “insensitive” and “inappropriate.”
On the morning of April 29, 1992, Louise Kohn, Michael Kohn, Elizabeth Kwapick and Professor Burnham met with UMD Chancellor Lawrence lanni to explain the display and protest Karon’s attempted censorship of the pictures and the students’ work. During that meeting, Chancellor lanni said that he personally found nothing wrong with the photographs.
On the afternoon of the same day, the history department held a meeting on this issue, which was also attended by lanni, Ka-ron, and Dean Red Horse. During that meeting, Chancellor lanni again stated that he personally saw nothing wrong with the photographs, but hinted that he nevertheless might support their removal.
When asked to explain why she wanted the pictures censored, Karon tried to tie them in with a written threat against Professor Judith Trolander and other members of the department, which had been found on March 16, 1992. Members of the department told Karon that they thought her attempt to link the pictures to this deranged threat was absurd. (Plaintiffs allege that Professor Tro-lander had not initially been offended in any way by the pictures, in fact, she participated in the project by posing for a photograph and specifying her specialties, a personal quotation and historical heroes. On the day it was put up she said that she thought the display was “very nice.”) Karon also stated at that meeting that she considered the photographs to constitute sexual harassment. She was unable to explain what she meant by this. Karon was asked by what authority she could order the removal of a student departmental display, and she was not able to give any satisfactory answer.
On May 4, 1992, Chancellor lanni ordered UMD Plant Services Director Kirk Johnson to remove the pictures of Professors Burn-ham and Márchese, but he reported he was unable to obtain access. lanni then ordered UMD police to remove the photos, and the next day, UMD Police Captain Michalicek went to the history department and removed the photographs. The photographs were apparently given to Karon, who locked them up. Ultimately, through the efforts of Captain Michalicek, they were returned to Michael and Louise Kohn. Only the two photographs with weapons were removed. The other nine photographs remained on display. Professors Burnham and Márchese then removed the balance of their contributions to the display.
II. DISCUSSION
The court’s opinion concedes as it must that the censored presentation at issue was constitutionally protected free speech. See, e.g., Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06, 89 S.Ct. 733, 735-36, 21 L.Ed.2d 731 (1969); Tindle v. Caudell, 56 F.3d 966, 969 (8th Cir.1995). And, “[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.” Tinker, 393 U.S. at 506, 89 S.Ct. at 736. Indeed, the idea that a faculty member can be compelled to relinquish First Amendment rights in connection *1023 with employment at a public school has been “unequivocally rejected.” Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).
A. Pickering Balancing
The court contends, however, that the right to express this particular free speech must be balanced by the state employer’s right to content suppression in the name of work place efficiency and harmony. It then employs a line of wholly inapposite employee discipline and termination eases to summarily dispose of the violation of the faculty members’ First Amendment rights. See, e.g., Pickering, 391 U.S. 563, 88 S.Ct. 1731 (teacher discharged for letter written to newspaper criticising school board and school superintendent); Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (assistant district attorney discharged for distributing questionnaire concerning office morale and policy and confidence in supervisors); Waters v. Churchill, 511 U.S. 661, -, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (nurse discharged over statements dealing with hospital working conditions); and Tindle, 56 F.3d 966 (police officer suspended for attending Fraternal Order of Police party wearing blackened face, bib overalls, black curly wig and carrying watermelon).
These cases are inapplicable for at least two reasons. The speech at issue in Pickering, Connick and Waters was directly critical of the efficiency and operations of the employers’ business. In Tindle there was evidence that the conduct (although indirect in presentation) directly led to racial friction and disharmony within the Little Rock Police Department, thus affecting work place morale and efficiency. Here the speech was essentially supportive of University operations, extolling the capabilities and interests of certain faculty members. Contrary to the conduct in Tindle, the photographs of Burn-ham and Márchese were not presumptively divisive, even in the ambiance of the threats detailed by the court, nor were they shown to have been a palpable threat to work place morale, efficiency or harmony.
There was also no adverse employment action against which a free speech right might be balanced. When put to the test on this misuse of precedent, the court curiously explains, supra at 1014 n. 5, that the censorship itself is somehow the adverse employment action. Turning to Tindle, a case mightily relied upon by the court, an apt analogy, considering this argument, would be for the police to have seized Tindle’s bib overalls, black curly wig and his watermelon and called it an adverse employment action. The adverse employment action was, of course, the officer’s suspension.[12]
Even if this “square peg in round hole” approach by the court were to have any validity at all, which it does not, it would fail on the facts. I do not believe that an employer must unreasonably endure dissident and offensive speech without recourse simply because of the First Amendment. As noted in Waters, however, the government employer must make a substantial showing that the speech is, in fact, disruptive before it may be punished. Waters, 511 U.S. at -, 114 S.Ct. at 1887. I concede the court’s point that a government, as an employer, has broader powers in suppressing free speech than a government as a sovereign. I further concede that we have given some deference to an employer’s predictions of work place disruption. Id. We have never given, however, and indeed we have rejected, any deference to a government supervisor’s bald assertions of harm, especially those, as here, that are based on conclusory hearsay and rank speculation.[13] Recently we observed that “it is critical to determine whether the defendants [employers] have put the Pickering balancing test at issue by producing evi *1024 dence that the speech activity had an adverse effect on the efficiency of the ... employer’s operations.” Grantham v. Trickey, 21 F.3d 289, 294 (8th Cir.1994). We have noted that “[a] public employee’s exercise of free speech rights affects the efficiency of the operation of the public service when [the evidence shows that] it affects the morale of the work force and damages the program’s reputation.” Id. at 295. This is a burden that falls upon the employer. For instance, the Supreme Court, in Pickering, noted that “no evidence to support [professional damage to the school board and superintendent] was introduced at the hearing” and rejected the work place disruption argument of the board. Pickering, 391 U.S. at 570, 88 S.Ct. at 1735-36.
Part 11(C) of the court’s opinion, which attempts to address Burnham and Mareh-ese’s First Amendment rights, is a salmagun-di of erroneous arguments and conclusions that are difficult to respond to in a concise and orderly fashion. The “mix and match” character of the opinion results from the court’s need to respond to an act of “politically correct” censorship searching for a lawful rationale — after the fact. Properly analyzed, Ianni’s position is simply not defensible.
As conceded by the court, the Pickering/Connick balancing test, if at all applicable, which it is not, requires the court to determine whether the professors’ free speech rights “outweigh the interests of [UMD] in promoting the efficiency and effectiveness of the public services it performs,” supra at 1017, here the educational mission of the University. Unfortunately, the court, at best, pursues an apples and oranges approach. It seems to attempt to balance the free speech rights against, on the one hand, a purported campus “atmosphere of tension and fear,” supra at 1018, and on the other hand, but only peripherally and obliquely, the disruption of the pedagogical mission of UMD. Because we are dealing with summary judgment rather than the results of a trial, we note that the impact of the free speech on the campus’s atmosphere, if any, is hotly disputed. Its impact upon the educational mission of UMD is totally unproven and unaddressed except in the most conclu-sory fashion.
Of course, there is really no evidence that the offending photographs actually impacted the campus atmosphere at all. The best that can be said for the court’s extensive discussion of the alleged threats to Ms. Feather-man and Ms. Trolander, see supra at 1011, is that some campus milieu may have been created by acts that occurred in June of 1991 and early March of 1992, acts preceding the erection of the display. Obviously, the then non-existent photographs had no effect upon the environment created by these incidents. Indeed, Ianni’s memo of March 16, 1992, purportedly dealing with these threats, preceded the March 27, 1992, posting of the display. And, although the affidavits of both Burnham and Márchese expressly discount and deny that a “climate of fear” existed on campus, clearly placing the “atmosphere” issue in dispute for summary judgment purposes, see Burnham Affidavit Appellees’ App. at 17 and Márchese Affidavit Appellees’ App. at 27, it is obvious that the photographs had nothing to do with the campus ambiance that existed at the time of Ianni’s March 16 memo. Thus, the test, flunked by Ianni so far, is what effect, if any, did the photographs have on University functions. The present record leaves this question unanswered.
Even if, for the sake of argument, I were to concede the existence of pre-existing campus tension arising from the Featherman and Trolander episodes, there is absolutely no evidence, except for Ianni’s sweeping conclusions, that establishes a nexus between the two photographs and an exacerbated atmosphere of fear on the campus or, more importantly, that establishes a relationship, direct or indirect, between the photographs and the *1025 “efficiency and effectiveness” of UMD’s mission in public education. Evidence that the photographs increased campus-wide tension which in turn diminished the efficiency of the mission of UMD is totally absent, not just in dispute, although even a dispute of fact would doom a grant of summary judgment for Ianni on the basic First Amendment issue.
Additionally, qualified immunity, the issue that gives this court jurisdiction to review the district court’s denial of summary judgment, is an affirmative defense that Ianni must assert. Siegert v. Gilley, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793-93, 114 L.Ed.2d 277 (1991). Thus, Ianni had the burden of proving, Watertown Equip. Co. v. Norwest Bank Watertown, 830 F.2d 1487, 1490 (8th Cir.1987), cert. denied, 486 U.S. 1001, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988), that the constitutional right asserted by the plaintiffs was not clearly established at the time of the incident or if established, was not discernible to an objective government official under the facts available or, in the alternative, of proving the “necessary concomitant” that plaintiffs have not asserted “a violation of a constitutional right at all.” Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. It is the alternative inquiry that the court primarily relies upon today, i.e., is there a constitutional violation at all? As I have noted, Ianni has simply not shouldered his burden of proof as to this prong of qualified immunity jurisprudence or, at the very least, he has left a factual inquiry on this issue on the table to be fleshed out at a trial.[14]
The court’s secondary attempt to pump air into its reversal balloon, through a finding of qualified immunity enforceable through summary judgment, quickly deflates with the failure of proof on the basic Pickering/Con-nick issue. Beyond that, however, the court advances a new and surprising theory that whenever a Pickering/Connick balancing test is required, government officials must always be awarded qualified immunity. Supra at 1018-19.[15] Although it admits the existence of several cases contrary to its theory, see supra at 1018-19 n. 9, the court fails to cite the most analogous case, Kincade v. City of Blue Springs, Missouri, 64 F.3d 389 (8th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996), even though a member of the panel majority joined that opinion.
Kincade was discharged by Blue Springs for exercising his free speech rights. Because Kincade’s speech touched on a matter of public concern, as does the speech in this case, the Pickering/Connick balancing test was employed to review a district court denial of a motion for summary judgment on qualified immunity grounds. The court, noting that the only evidence of workplace disruption was a conclusory statement to that effect by the mayor and other city officials, asserted:
the Appellants [city officials] have merely asserted that Kincade’s speech adversely affected the efficiency of the City’s operations and substantially disrupted the work environment without presenting any specific evidence to support this assertion, They therefore have not put the Pickering balancing test at issue, and accordingly, we reject their claim that they are entitled to *1026 qualified immunity because free speech questions for public employees, as a matter of law, cannot be “clearly established.”
Kincade, 64 F.3d at 398-99. This is precisely the factual and legal situation we have in this ease and the court’s opinion clearly violates the precedent established in Kincade.
Admittedly in different contexts, two recent cases generally dramatize the burden of proof allocation when free speech is at issue. In 44 Liquormart, Inc. v. Rhode Island, — U.S. —, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), decided this past term, a case involving commercial advertising, a commodity recognized as more freely subject to regulation than other forms of protected speech, id. at —, 116 S.Ct. at 1504, the Supreme Court rejected the premise that the merchant/advertiser had the burden of disproving Rhode Island’s stated reason for the speech regulation, to-wit: the promotion of temperance by the reduction of alcohol consumption. The Court, rejecting even a presumption in favor of the state arising from the Twenty-first Amendment said:
[W]e note that a commercial speech regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose. For that reason, the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so to a material degree. The need for the State to make such a showing is particularly great given the drastic nature of its chosen means — the wholesale suppression of truthful, nonmisleading information.
Id. at —, 116 S.Ct. at 1509 (citations and internal quotations omitted). The Court, here, affirms the wholesale suppression of truthful, nonmisleading free speech, of a higher order than liquor advertising upon Ianni’s self-serving, factually -unsupported, subjective state of mind that the censorship might “maintain a positive and efficient working and learning environment conducive to the mission of an academic institution.” Supra at 1015.
In an even more recent case, Forbes v. Arkansas Educ. Television Comm’n, 93 F.3d 497 (8th Cir.1996), in an opinion concurred in by the majority members of this panel, in litigation in which a minor candidate was excluded from a televised debate because a government functionary thought he was not a “viable” candidate, this court said, “We hold that a governmentally owned and controlled television station may not exclude a candidate, legally qualified under state law, from a debate [free speech] organized by it [the television station] on such a subjective [lack of viability] ground. To uphold such a defense would, in our view, place too much faith in government.” Id. at 500. The same goes for the subjective suppression advanced here. In sum, the court’s holding that “Ianni need only [make] a minimal showing of potential disruptiveness to justify his actions,” supra at 1015, is simply an incorrect statement of First Amendment law.
Giving the best gloss possible to the facts adduced by Ianni, nothing remotely approaching lower morale and program damage at UMD was established. The censorship itself did more damage to the morale of the history department than any other possible event except, perhaps, the announcement of a budget cut. Viewing the competing affidavits favorably to Burnham and Márchese, as we must at this summary judgment juncture, we find only three or four people in support of censorship and none of them offering objections or reasons running directly to institutional morale or program damage. As stated earlier, Judith Karon, at the time UMD’s affirmative action officer, thought the display was “insensitive and inappropriate.” She later thought the photographs might somehow constitute “sexual harassment.” Professor Trolander, a member of the history department faculty, at first thought the displays were “very nice” but later, apparently, thought the display was inappropriate. The other offended individual revealed in the record was Charlotte Macleod, the original complainant, an assistant professor at UMD and the head of the UMD Commission on Women. Without derogation of the strong feelings of these three individuals, their states of mind are not reason enough to allow the University administration to run roughshod over the First Amendment rights of Burnham and Márchese.
Finally, the court notes, supra at 1016 n. 7, that later in 1992, copies of the photographs censored by Ianni were posted at the student center on campus without complaint of any *1027 kind and without any evidence of an institutional breakdown.[16] Far from proof of the propriety of Ianni’s earlier censorship, as the court contends, this is evidence that there never could have been a showing of work place disruption. Free speech is free speech whether it occurs in May in the history display case or in August at the campus student center.
The facts fail to support Ianni’s position, and the district court so found. Judge Davis stated “[t]his is not an employment ease where there is a threatened disruption to the efficient delivery of services.” Burnham v. Ianni, 899 F.Supp. 395, 400 (D.Minn.1995). The court, in its summary judgment, fact-finding exercise, seems to have found this holding to be clearly erroneous. It is, however, the court that is in error.
B. Content Suppression
The most troublesome aspect of the court’s opinion is its failure to properly analyze the real free speech/censorship issues brought clearly into focus in this ease. These are the issues summarily, and incorrectly, disposed of by the court in Part 11(E) under the heading “The Kohns’ First Amendment rights.” Supra at 1019. The violation involved all four plaintiffs’ First Amendment rights and not just those of the students.
The court discusses the nature of the forum, an irrelevant matter. Even so, its conclusion is wrong. Under the facts of this action, the display case was clearly a limited designated forum, Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983).[17] See also Forbes, 93 F.3d at 499-500. Thus, the content-based suppression at work here must have served a compelling state interest through censorship narrowly drawn to serve that interest. Widmar v. Vincent, 454 U.S. 263, 270, 102 S.Ct. 269, 274-75, 70 L.Ed.2d 440 (1981). No such test was applied in this case by either Ianni or the court and no such showing could possibly have been made under the undisputed facts of this litigation.
At the bottom line, however, the nature of the forum makes little difference. Even if the display case represented a closed forum, Ianni violated the First Amendment rights of the plaintiffs, and in a way that any objective University chancellor would or should have known.
We need look no further than Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, for controlling precedent although the answer is so fundamental it governs dozens of eases decided in this circuit alone. In Tinker, of course, three students, ages sixteen, fifteen and thirteen, wore black armbands during attendance at their respective Des Moines senior and junior high schools to publicize their objections to the Vietnam War. A few students made hostile remarks to the students wearing armbands but there were no threats or acts of violence on school premises. Id. at 508, 89 S.Ct. at 737. The school authorities were found by the district court to have acted reasonably in prohibiting the armbands “because [the action] was based upon [the school’s] fear of a disturbance from the wearing of the armbands.” Id.
The Supreme Court rejected this conclusion saying “in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.” Id. The Court further noted that “[i]n our system, state-operated schools *1028 may not be enclaves of totalitarianism.” Id. at 511, 89 S.Ct. at 739. Freedom of expression may be regulated only with a specific showing of a constitutionally valid reason. Id. There had to be a factual showing that the suppressed conduct would “materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.” Id. at 509, 89 S.Ct. at 738.
As in Tinker, there is no such showing made here by lanni. The after-the-act recitation of outside threats made against a faculty member and a UMD administrator, with no shown or known connection to the history department display, is simply a “red herring” drawn across the trail leading from the University chancellor’s suite, via the affirmative action officer’s quarters, to the unconstitutional censorship of two photographs totally unrelated to the purported concern. The argument that a photograph of a male, laurel-wreath bedecked UMD faculty member holding a Roman short sword, as part of a eleven-person faculty display, somehow exacerbated or threatened to exacerbate a purported, but unproven, atmosphere of fear on the UMD campus is almost laughable. There was no valid constitutional basis for the censorship, it was simply an act of regulation of what Karon believed to be politically incorrect speech, a display of weapons.
III. CONCLUSION
Followed to its logical conclusion, the court’s holding simply permits the suppression of too much speech on arbitrary and capricious grounds. Indeed, the opinion would even permit suppression of Sandra Featherman’s advocacy of gender and cultural diversity at UMD if Chancellor lanni subjectively felt that such speech contributed to an inefficient and negative working and learning environment on the campus because of unlawful or vehement, but protected, opposition to Featherman’s views. Surely that cannot be the law in this circuit.
Further, the court grants the motion for summary judgment based upon qualified immunity because it finds no First Amendment violation. The court improperly limits the facts it considers, mistakenly applies a Pickering/Connick balancing test and accepts self-serving statements by lanni, unsupported by evidence except evidence of the political correctness concerns of two faculty members and an affirmative action administrator. This is error. I dissent.
ORDER
Dec. 4, 1996
The petition for rehearing with suggestion for rehearing en banc is granted. Judge Murphy did not participate in the voting.
The opinion and judgment of this court filed October 16,1996 are vacated.
The ease is set for oral argument on Tuesday, January 14, 1997 in the U.S. Court and Custom House in St. Louis, Missouri.

. It does not appear that discovery of any kind has been conducted in this case. Apparently all facts are advanced through plaintiffs’ pleadings and affidavits submitted by the parties.

. Tindle is inapposite for an additional reason. It involves a police department which, as pointed out by Judge Loken in Bartlett v. Fisher, 972 F.2d 911 (8th Cir.1992), "as a paramilitary force, should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks.” Id. at 918. (See further discussion infra at 1025). The more apposite case, unmentioned by the court, is Kincade v. City of Blue Springs, Missouri, 64 F.3d 389 (8th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996), a matter that is factually on point with this action and arrives at a contrary conclusion. (See further discussion infra at 1025-26).

. The factual differences between this case and Tindle are dramatic. .Undisputed evidence was presented in Tindle showing that racial divisiveness existed prior to the incident in question *1024 sufficient to cause the police department to hire an individual to conduct "prejudice reduction workshops;” that several African-American officers resigned from the Fraternal Order of Police over the incident; that Tindle's conduct violated a department rule; and that Tindle admitted that his acts had "humiliated and offended a number of African-American [police] officers.” Tindle, 56 F.3d at 968. Here, there was no showing even remotely approaching these proportions. Indeed, only two people, for certain, Karon and Macleod, were critical of the display and the basis for their criticism had little, if anything, to do with the ongoing efficiency and effectiveness of the educational operation at UMD.

. While our cases frame this alternative inquiry as one leading to a determination of qualified immunity, the procedure actually tests whether a viable claim for relief has been stated under 42 U.S.C. § 1983. Ordinarily, denial of a motion for failure to state a claim is interlocutory and unappealable. When coupled with an affirmative defense of qualified immunity, however, the "failure to state a claim" issue becomes appeal-able under the rationale set forth in Siegert. In my view, if a constitutional right has not been asserted “at all,” a defendant has no need for immunity. Siegert, 500 U.S. at 232, 111 S.Ct. at 1793. The case should simply be dismissed for the lack of a workable claim. Conceptually, immunity is only needed to protect a government actor from suit if an actual constitutional violation has occurred.

. The cases cited by the court exclusively involve police and paramilitary employers that this circuit has treated differently than general governmental bodies, schools and colleges, especially where, as here, elements of academic freedom are present. We have held that paramilitary employers have a heightened interest in regulating the speech of its employees to promote loyalty, obedience in the ranks and public confidence in the units. See, e.g., Bartlett v. Fisher, 972 F.2d 911, 918 (8th Cir.1992) (noting paramilitaiy government employer "should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks”).

. The court excuses this inconsistent position by reference to an "improved” atmosphere. Supra at 1016 n. 7. I find no support in reason or precedent for such a rationale. The plaintiffs point out in their brief that UMD students recognized the censorship even if Ianni and Karon did not. The student center display was, apparently, on the subject of censorship and was headed "The Administration Does Not Want You to See These.” The second showing argument advanced by Ianni and accepted by the court was characterized by Judge Davis as “at best, disingenuous.” Burnham v. Ianni, 899 F.Supp. 395, 401 (D.Minn.1995).

. The display case, as earlier noted, was in the hall outside the history department’s classrooms and had been placed there to hold information about the department, the faculty and students for the benefit of students, prospective students and the public. Displays in the case were designated and intended to communicate truthful, nonmisleading ideas to students, prospective students, faculty and the public on a permanent, ongoing basis.